## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amy Manni,

               Plaintiff,               **MEMORANDUM OPINION**
                                       **AND ORDER**
      v.                           Civil No. 05-712 ADM/JSM

ORS Nasco,

               Defendant.

_____

Bryan R. Howard, Esq., Milavetz, Gallop & Milavetz, P.A., Edina, MN, on behalf of Plaintiff.

Gerald L. Hilsher, Esq. and Michael J. Dailey, Esq., Boone, Smith, Davis, Hurst & Dickman, Tulsa, OK; and Dawn C. Van Tassel, Esq., Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On April 19, 2006, oral argument before the undersigned United States District Judge was heard on Defendant ORS Nasco's ("Defendant" or "ORS Nasco") Motion for Summary Judgment [Docket No. 12]. In her Complaint, removed by Defendant from state court [Docket No. 1], Plaintiff Amy Manni ("Plaintiff" or "Manni") asserts claims for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.08. For the reasons stated herein, Defendant's Motion is granted.

## II. BACKGROUND

### A.      Company History

ORS Nasco was created by the merger of two formerly separate entities: Nasco, Inc. ("Nasco") and Oklahoma Rig and Supply, Inc. ("ORS"). ORS Nasco Ex. [Docket No. 14] A

(Cook Aff.) ¶ 4.  Nasco was a wholly owned subsidiary of Unidare, an international industrial

distribution group based in Dublin, Ireland.  Id.  Nasco, a wholesale distributor of welding and

safety supplies, had headquarters in New Brighton, Minnesota.  Id.  In April 1999, Unidare

purchased ORS, a wholesale distributor of industrial and oilfield supplies, headquartered in

Muskogee, Oklahoma.  Id.  After purchasing ORS, Unidare began the process of consolidating

the two sister companies into one, with the formal legal merger occurring in November 2002.  Id.

¶ 5; ORS Nasco Ex. C (Loos Aff.) ¶ 6.

　　　At the start of the merger process, many departments that existed in the separate entities

were consolidated into single departments and relocated to the new headquarters in Muskogee,

Oklahoma.  Cook Aff. ¶ 5.  Specifically, in 1999, the Accounting, Purchasing, Human

Resources, New Accounts, and Information Technology departments were consolidated.  Id.

Unidare did not, however, immediately consolidate ORS and Nasco's separate Sales departments

and Marketing departments.  Id.  Employees who chose not to relocate from Minnesota to

Oklahoma in 1999 were offered "stay bonuses" to remain with the Minnesota Nasco office for a

period of time to ensure a smooth transition for ORS Nasco.  Id. ¶ 6.  Once the transition period

ended, employees that did not relocate were terminated without severance benefits.  Id.  Only

one Minnesota employee agreed to relocate to Oklahoma—William Scheller ("Scheller"),

Unidare's U.S. president.  Loos Aff. ¶ 7.  Scheller became president of ORS Nasco.  Id.

　　　At the time that Unidare purchased ORS, there were approximately thirty employees in

Nasco's Minnesota office.  Loos Aff. ¶ 4.  Manni avers that Nasco had approximately fifty

employees: twenty "sales force" employees who were not physically located in the office, and

thirty "office" employees.  Manni Dep. at 38.  After the merger, approximately twenty "office"

jobs were relocated to Oklahoma.  Id. at 39.  Manni avers that at the time she left the company,

approximately eleven people worked in the Minnesota office.  Id. at 39-40.  The eleven

remaining office employees included Craig Loos ("Loos"), Executive Vice President of Sales

Development; Mike Muenzer ("Muenzer"), Regional Sales Director; Jennifer Emmett

("Emmett"), Administrative Assistant; Dave Pederson ("Pederson"), Vendor Managed Inventory

("VMI") department; Mike King ("King"), VMI department; Manni, Sales Coordinator; and six

customer service representatives.  Id. at 40-41.

In September 2002, Unidare began preparations to complete the merger of ORS and

Nasco by consolidating the two companies' separate Sales and Marketing departments into one

Sales department and one Marketing department, located in Muskogee, Oklahoma.  Cook Aff. ¶

7.  Scott Rosenzweig ("Rosenzweig") was hired as Vice President of Sales for the newly-

consolidated Sales department.  Id.  Prior to the merger, Muenzer was the Vice President of

Sales for Nasco and Steve Thompson was the Vice President of Sales for ORS.  Cook Aff. ¶ 5;

ORS Nasco Ex. D (Muenzer Aff.) ¶ 3.  ORS Nasco offered Muenzer a lateral transfer to Vice

President of National Accounts, which would have required Muenzer to move to Oklahoma.

Muenzer Aff. ¶ 5.  So that he could remain in Minnesota, Muenzer declined the position and

instead accepted a demotion (with the same pay and benefits) to Regional Sales Director for the

Midwest Region.  Id.; Cook Aff. ¶ 8.  Muenzer reported directly to Rosenzweig.  Cook Aff. ¶ 8;

ORS Nasco Ex. E (Rosenzweig Aff.) ¶ 3.

**B.      Manni's Employment**

On November 3, 1997, Manni was hired by Nasco as a Buyer Trainee with a starting

salary of $19,000.  ORS Nasco Ex. B (Manni Dep.) Ex. 3.  Manni's direct supervisor was Dave

Pederson. Id. at 32. Over the years, Manni consistently received good performance reviews, salary increases, and promotions. In October 1998, Manni's salary was raised to $25,000. Id. at 44. In April 1999, Manni was promoted to Pricing Product Coordinator, and her salary increased to $26,800. Id. at 43-44. In October 1999, Manni was promoted to Sales Coordinator, and her salary jumped to $35,000.[1] Id. at 42, 45. In her new position, Manni reported directly to Muenzer. Id. at 42. In October 2000, her salary was raised to $36,400. Id. at 45.

## C.    Manni's First Pregnancy and Changes at ORS Nasco

In August 2000, Manni became pregnant with her first child. Id. at 56. Early in her pregnancy, Manni developed hyperemesis, an extreme version of morning sickness, characterized by symptoms of nausea, vomiting, loss of appetite, loss of weight, and fatigue. Id. Manni took a medical leave of absence from work from September 26, 2000 to November 27, 2000, and received short term disability payments. Id. at 57, 59, 62. Manni then returned to work until her son was born on May 10, 2001. Id. at 63. After her son was born, Manni took approximately twelve weeks of leave, until August 7, 2001. Id. at 64. Manni again received short term disability payments. Id. at 64-65. In total, Manni was absent from work for twenty weeks in connection with the birth of her first son.

Shortly before her son was born, Manni requested to reduce her work week from five days to four days so that she could have an extra day home with her new son. Id. at 70. Nasco approved Manni's request on a "test" basis, to be reevaluated in December. Id. at 72-73, Ex. 22.

---

[1] Manni's former position of Pricing Product Coordinator was relocated to Oklahoma. Manni alleges that the Sales Coordinator position was specifically created for her in 1999 around the time of the ORS Nasco merger because she did not want to move to Oklahoma and ORS Nasco wanted to retain her as an employee. Howard Aff. [Docket No. 41] Ex. G (Manni Aff.) ¶ 4; Manni Dep. at 47.

Manni maintained the same level of pay but changed from a salaried to an hourly employee, at the rate of $17.50 per hour.  Id. at 74.  Manni was allowed to participate in Nasco's benefits plans, including 401K, paid time off, and paid holidays.  Id. at 73.  On May 1, 2002, Manni's pay was raised to $18.20 per hour.  Id. at 51.  In June 2003, Manni's pay was raised to $18.75 per hour.  Id. at 53.

On April 1, 2003, Manni began reporting directly to Rosenzweig instead of Muenzer.  Rosenzweig Aff. ¶ 3.  At that time, Manni and Muenzer were the only two employees remaining in the Minnesota office that reported directly to Rosenzweig.  Id.  On May 14, 2003, during ORS Nasco's Senior Team's[2] monthly meeting, Rosenzweig stated the Sales Coordinator position should be relocated to Oklahoma to increase efficiency and communication.  Id. ¶ 5; Cook Aff. ¶ 10; Loos Aff. ¶ 10; Howard Aff. Ex. B (Loos Dep.) Ex. 4.  On July 16 and 17, 2003, the Senior Team again discussed the relocation issue and affirmatively decided to move the Sales Coordinator position to Oklahoma.  Rosenzweig Aff. ¶ 6; Cook Aff. ¶ 10; Loos Aff. ¶ 10.  It was determined that the transfer would occur sometime in the fall of 2003, but because no definite date was chosen, the relocation decision was not announced to the company employees.  Rosenzweig Aff. ¶ 6; Cook Aff. ¶ 10.

**D.      Manni's Second Pregnancy and Final Days at ORS Nasco**

In August 2003, Manni announced to ORS Nasco that she was pregnant with her second child.  Manni Dep. at 82.  Manni again developed hyperemesis, and on August 28, 2003, began a

---

[2] In 2003, the Senior Team of ORS Nasco consisted of President, Bill Scheller; Executive Vice President of Sales Development, Craig Loos; Vice President of Sales, Scott Rosenzweig; Vice President of Operations, Mark Prox; Vice President of Marketing, Larry Davis; and Vice President of Finance and Administration, Jean Cook.  Cook Aff. ¶¶ 2-3.

leave of absence, during which she again received short term disability benefits.[3]  Id. at 102-03.

Manni states that although Rosenzweig initially "seemed fine" with her pregnancy, after she

began missing work, he asked her how much work she would be missing.  Manni Aff. ¶ 14.

When Manni told him that she missed eight weeks because of complications during her first

pregnancy, Rosenzweig "gasped."  Id.  He asked if she would be missing the same amount of

work during this pregnancy, and Manni responded that there was "no way of knowing for sure."

Id.  In her deposition, Manni testified that Rosenzweig stated that he obviously wished she was

at work instead of at home sick.  Manni Dep. at 103.

On September 24, 2003, the senior team met and finalized plans for the transfer of the

Sales Coordinator position to Oklahoma.  They decided to make the transfer effective October 1,

2003, coinciding with the beginning of ORS Nasco's new fiscal year.  Cook Aff. ¶ 11.  ORS

Nasco decided not to tell Manni of her job relocation until she returned to work, so as not to

"disturb" her while she was on medical leave.  Id.

In mid-October 2003, Jeremy Jackson ("Jackson"), of ORS Nasco human resources,

called Manni to remind her to submit further short term disability paperwork.  ORS Nasco Ex. F

(Jackson Aff.) ¶ 7.  Manni told Jackson that she was feeling better and might be able to return to

work within the next week or two.  Id.  While Jackson states Manni did not express any definite

plans to return to work on any specific date, Manni alleges that she specifically stated that she

would try to return to work on October 28, 2003.  Id.; Manni Dep. at 87.  Jackson avers that he

did not discuss Manni's tentative plan to return to work with anyone else at ORS Nasco so as not

---

[3] Manni did work half-days on September 11 and 12, 2003.  Manni Aff. ¶ 25.

to create any false expectations regarding her return.[4]  Jackson Aff. ¶ 7.  Manni states that

Jackson also asked her about her upcoming maternity leave.  Manni Dep. Ex. 23 at 3.  He wanted

to know how much time she was planning on taking after the baby was born, and she stated that

she was planning on taking twelve weeks.  Id.

Manni did in fact return to work on October 28, 2003.  Manni Dep. at 86-87.  When

Manni arrived at work, she was not able to gain access to the building through her passkey, and

was eventually let into the building by her co-worker, Mike King.[5]  Id. at 88-89.  When she

arrived at her desk, her computer was on because her co-worker, Jennifer Emmett, had been

using her computer.  Id. at 90; ORS Nasco Ex. G (Emmett Aff.) ¶ 7.  Because Manni's computer

was on, she was able to use it that day.  Manni Dep. at 89-90.  Manni immediately emailed

Rosenzweig and Muenzer to let them know she was back at work, and to ask them what she

should start working on first.  Id. at 88.  Manni did not hear back from Oklahoma all day.[6]  Id. at

89.  Manni conducted some work on her own, and at 5:00 p.m., she shut down her computer and

---

[4] It is undisputed that while ORS Nasco did receive a short term disability form from
Manni's doctor which indicated a return to work date of October 28, 2003, it did not receive the
form until November 3, 2003.  Manni Dep. Ex. 24.

[5] ORS Nasco avers that it is office policy to suspend employees' building and computer
access when they go on an extended leave of absence from the company, and procedure is the
reason that Manni's passkey and computer password were not working when she returned to
work unannounced.  Cook Aff. ¶ 12.

[6] Contemporaneously with Manni's return to work, ORS Nasco was holding its national
sales meeting in Tulsa, Oklahoma from October 24-29, 2003.  Rosenzweig Aff. ¶ 9.  All of ORS
Nasco's sales personnel and the members of the Senior Team were required to attend the
meeting.  Id.  Rosenzweig presided over the sales meeting, and avers that he was extremely busy
making presentations, participating in various breakout sessions, meeting with different sales
groups, providing training, and conducting coaching sessions.  Id.  Therefore, he did not check
his email or voicemail during the meeting.  Id.  As a result, Rosenzweig did not receive any
email or phone messages from Manni until late on October 29 or early on the morning of
October 30, 2003.  Id. ¶ 10.

left for the day.  Id. at 89-90.

The next day, October 29, 2003, Manni was again unable to gain access to the building through her passkey and instead entered a side door using a non-electronic key in her possession. Id. at 90, 92.  Manni tried to log on to her computer using her own password, but was unable to log on.  Id. at 90.  Manni called the help desk and told Teresha Majors ("Majors") her password was not working.  Id.  Majors said she would see what she could do to fix the problem.  Id. Manni then called Emmett to see if Emmett had changed her password.  Id. at 91.  Emmett stated that she did not know why the password was not working and that Manni would have to speak with Rosenzweig.  Id.  Manni called Majors again, and Majors stated that she would not be able to help Manni until Manni spoke with Rosenzweig.  Id.  Manni then called Rosenzweig four times and left two messages, but did not hear back from Rosenzweig that day.  Id.  Manni avers that she "had a feeling that something was not right with [her] job."  Id. at 91-92.  She packed up her personal belongings (although she left them at the office) and went home at 5:00 p.m.  Id.; Manni Aff. ¶ 22.

Manni returned to work the following day, October 30, 2003, and again used her non-electronic key to enter the building.  Manni Dep. at 92.  Her computer password still did not work, and she had no voice messages from Rosenzweig.  Id.  Craig Loos had returned from the sales meeting in Oklahoma and was back in the Minnesota office.  Loos Aff. ¶ 12.  When Manni asked Loos if something was going on with her job, he told her she would have to speak to Rosenzweig.  Manni Dep. at 92-93; Loos Aff. at ¶ 12.  At approximately 9:00 a.m., Rosenzweig called Manni and informed her of ORS Nasco's decision to relocate her job to Oklahoma. Rosenzweig Aff. ¶ 11; Manni Dep. at 142.  Rosenzweig offered Manni the job in Oklahoma.

8

Rosenzweig Aff. ¶ 11; Manni Dep. at 142.  Manni responded that moving was not an option for her family.  Rosenzweig Aff. ¶ 11; Manni Dep. at 142.  Rosenzweig said she could have a week to think it over, but Manni responded that she did not need time to think it over because moving was not an option for her.[7]  Rosenzweig Aff. ¶ 11; Manni Dep. at 142.  Manni avers that Rosenzweig then told her to pack up her personal belongings and leave the building immediately.  Manni Dep. at 143.  Rosenzweig avers that he never ordered her to leave immediately, and would have preferred her to give two weeks notice and assist in training a replacement.  Rosenzweig Aff. ¶ 11.  Rosenzweig also avers that although Manni had one week to consider the offer, ORS Nasco did not expect her to move within one week, and she would have been given "ample time" to relocate to Oklahoma.  Id. ¶ 12.  After the conversation ended, Manni took her personal belongings and left.  Mike King helped Manni carry her personal belongings to her car.  Manni Dep. at 99; King Aff. ¶ 5.

On October 31, 2003, Manni sent an email to Rosenzweig and Scheller, stating that she was out sick because of continued complications with her pregnancy and would be out until further notice.  Manni Dep. at 100, Ex. 31.  She also requested information about a formal relocation package.[8]  Manni Dep. at 101, Ex. 31.  Manni states on November 4, 2003, after not hearing back from Rosenzweig or Scheller, she emailed them both again.  Manni Aff. ¶ 24.  Again she did not hear back from either of them.  Id.  On November 6, 2003, Manni received a

---

[7] Rosenzweig avers that Manni said: "I quit.  I'm not interest in moving to Muskogee, Oklahoma."  Rosenzweig Aff. ¶ 11.

[8] Rosenzweig avers that on October 31, 2003, Manni was considered a "former employee."  Rosenzweig Aff. ¶ 14.  As a result, he did not respond to her email, but instead forwarded it on to Jeremy Jackson for further handling, consistent with ORS Nasco policy.  Id.

letter from Jeremy Jackson stating that since she had turned down the offer of relocation, her employment was considered terminated as of October 30, 2003.  Id. ¶ 25; Manni Dep. Ex. 32. ORS Nasco's policy is not to rehire any employee who quits without giving two weeks notice. Cook Aff. ¶ 17.  ORS Nasco avers that because Manni quit without notice, she is not eligible for rehire.  Id.

On December 12, 2003, Manni filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on sex.  Manni Dep. Ex. 36.  On September 8, 2004, the EEOC issued a Determination Letter, stating that there was "sufficient evidence" to support Manni's allegation that she was discharged due to her pregnancy.  Loos Dep. Ex. 3.  In the Determination letter, the EEOC stated: "[ORS Nasco's] president [Scheller] emphasized during the investigation that [ORS Nasco] had permitted [Manni] to take medical leave during a prior pregnancy earlier in employment, at great inconvenience to [ORS Nasco], because [Manni] was a good employee."  Id.  After an unsuccessful period of conciliation, Manni avers she received a "Right to Sue" letter from the Oklahoma EEOC on February 19, 2005.  Howard Aff. Ex. B (Manni Dep.) Ex. 23.

**E.     New Jobs for Other ORS Nasco Employees**

Manni argues that she was treated differently from other employees whose positions were also either eliminated or transferred to Oklahoma.  Dave LaForte ("LaForte") served as Nasco's Director of Marketing prior to the merger of ORS Nasco.  Loos Aff. ¶ 9.  When LaForte's position was transferred to Oklahoma, LaForte opted to transfer to an open Territory Sales Manager position so that he could remain in Minnesota.  Id.; Manni Dep. 161-62.  In November 2001, Mike Leir's ("Leir") position in the AIM department was eliminated.  Loos Aff. ¶ 5.  At

the same time, there was an open position in the customer service department in Minnesota, which Leir was allowed to transfer into after applying for the position.  Id.; Manni Dep. at 162-64.  At the time her job ended, ORS Nasco alleges it had no job openings in Minnesota to which Manni was qualified to be transferred.[9]  Cook Aff. ¶ 16.

### III. DISCUSSION

**A.    Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

---

[9] Of limited relevance to whether Manni quit or was terminated is her subsequent job search effort.  At her deposition, Manni stated that she was only interested in being re-employed if she could work in St. Paul, work four days per week, and make at least $40,000 per year.  Manni Dep. at 197-98.  When asked whether she and her husband were "a little ambivalent" about her going back to work, Manni responded "yes."  Id. at 198.

B.      **Discrimination Claims**

Title VII and the MHRA both make it an unlawful employment practice for an employer,

on the basis of sex, to discharge an employee, or discriminate against a person with respect to

compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a)(1);

Minn. Stat. § 363A.08, subd. 2.  Both statutes also similarly define "sex" to include pregnancy,

childbirth, or related medical conditions.  42 U.S.C. § 2000e(k); see Minn. Stat. § 363A.03,

subd. 42.[10]  In this case, Manni's pregnancy discrimination claims are analyzed under the

McDonnell Douglas burden-shifting framework.[11]  Holthaus v. Compton & Sons, Inc., 514 F.2d

651, 652 (8th Cir. 1975), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First,

the plaintiff must establish a *prima facie* case of discrimination.  Bergstrom-Ek, 153 F.3d at 857.

The plaintiff does this by showing: (1) she was a member of a protected class, (2) she was

qualified for her position, and (3) she suffered an adverse employment action under

circumstances giving rise to an inference of discrimination.  Id.  The burden then shifts to the

defendant to establish a legitimate, nondiscriminatory reason for the alleged discriminatory

action.  Id.  The burden then shifts back to the plaintiff to show that the legitimate reasons

asserted by the defendant are merely a pretext for discrimination.  Id. at 857-58.

ORS Nasco argues that Manni's claims fail because she can not establish a *prima facie*

case of pregnancy discrimination.  ORS Nasco further argues that even if Manni could establish

---

[10] Minn. Stat. § 363A.03, subd. 42 defines "sex" to include pregnancy, childbirth, and disabilities related to pregnancy or childbirth.

[11] The same standard is used to analyze both Title VII and MHRA claims, and therefore, the above stated analysis applies to both claims.  See Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998).

a *prima facie* case, her claims still fail because she can not establish that ORS Nasco's legitimate reasons for its actions are merely pretext for discrimination.

ORS Nasco does not contest the first two prongs of the *prima facie* case.  As a pregnant woman suffering from a pregnancy-related disability, Manni was a member of a protected class. Also, Manni was clearly qualified for her position, as favorable performance reviews, salary increases, and promotions bear out.  ORS Nasco's primary contention is that Manni can not establish a *prima facie* case because she did not suffer an adverse employment action.  ORS Nasco argues that the transfer of Manni's job from Minnesota to Oklahoma does not constitute an adverse employment action, and that the job transfer did not result in a constructive discharge. Manni responds that the cumulative effect of Manni's deactivated passkey, expired computer password, unreturned emails and phone calls, and job transfer (with ORS Nasco's alleged knowledge that Manni would not accept the transfer) constitute an adverse employment action. Manni also argues that she did not quit, but that she was terminated after stating that moving to Oklahoma was not an option for her.[12]  Finally, Manni argues that she was constructively discharged, which constitutes an adverse employment action.

"An adverse employment action is a tangible change in working conditions that produces

---

[12] The parties agree that when Rosenzweig informed Manni that her position had been relocated to Oklahoma, Manni promptly stated that moving was not an option for her. Rosenzweig next told Manni that she had a week to consider the offer, but Manni responded by stating that she did not need a week because moving was not an option for her.  What happened next is contested: Manni avers that Rosenzweig told her to pack up her things and leave the building, while Rosenzweig avers that he said no such thing because he would have preferred Manni to stay for two weeks and help train a replacement.  At her deposition, when asked whether she disputed that she quit her employment, Manni responded that she was forced to resign.  Manni Dep. 146-47.  The resolution of this factual dispute is unnecessary to the outcome of this case.

a material employment disadvantage." Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000).  "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not."  Id.  As Judge Richard Arnold wrote the Eighth Circuit has "squarely held" that:

> [A] decision to transfer an employee to another city, a transfer that the employee did not want, is not an adverse employment action of sufficient consequence to justify an action under Title VII, assuming . . . that the job is of equal pay and rank and with no material change in working conditions.

LePique v. Hove, 217 F.3d 1012, 1013 (8th Cir. 2000); see also Spears, 210 F.3d at 853-54; Hoffman v. Rubin, 193 F.3d 959, 964 (8th Cir. 1999); Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997); Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997).

The combined effect of Manni's deactivated passkey, expired computer password, unreturned emails and phone calls, and job transfer did not constitute an adverse employment action.  See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) (holding that a series of actions connected to one another constituted adverse employment action).  While the issues with the passkey, computer password, and unreturned emails and phone calls caused Manni to think that something was not right with her job, these occurrences were "minor changes" that "merely inconvenienced" Manni rather than "adverse employment actions under circumstances giving rise to an inference of discrimination."  Although there may be situations in which a transfer to another city is so intolerable that it constitutes an adverse employment action, Manni's situation is not such a case.  See Gartman, 120 F.3d at 130.  ORS Nasco did not make a decision to terminate Manni but rather offered her the opportunity to continue in her position after it was

transferred to Oklahoma.  There is no evidence that the transfer would have involved lower pay, a demotion, or a material change in work duties.  While the Court certainly can empathize with the disruption to a young family caused by a long distance move because of an unwanted job transfer, Manni's job transfer under these circumstances does not satisfy the adverse employment action requirement of a *prima facie* discrimination claim.

Manni's job transfer, along with Manni's passkey, computer password, and email and phone call issues, did not result in a constructive discharge.  "A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job."  Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981).  "The employee must show that a reasonable person in her situation would find the conditions of employment intolerable."  Gartman, 120 F.3d at 130.  An employee can demonstrate an employer's intent "by showing that [her] resignation was a reasonably foreseeable consequence of [her] employer['s] discriminatory actions."  Id.

While Manni had no interest in uprooting her family and moving to Oklahoma, the job transfer still did not result in conditions of employment that rise to the level of "intolerable."  A reasonable person may have found Manni's job transfer upsetting, but not intolerable.  In addition, the list of annoying occurrences when she returned to work that alerted her to think something was not right with her job occurred only over a three day span of time.  ORS Nasco explains that Manni's passkey and computer password were deactivated pursuant to a company policy that suspends building and computer access for an employee on an extended leave of absence, and Manni's emails and phone calls were not immediately returned because the entire sales team and Senior Team were attending a week-long conference in Oklahoma.  ORS Nasco's

15

uncontested explanation illustrates that "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast. . . . An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995).

Assuming *arguendo* that Manni can make out a *prima facie* case of discrimination, her claims still fail because she can not show that ORS Nasco's legitimate nondiscriminatory reasons for its actions are mere pretext for discrimination.  In other words, in considering ORS Nasco's explanation for its business decision, and viewing all the evidence in the light most favorable to Manni, there is no genuine issue of material fact concerning ORS Nasco's motivation for transferring Manni's position to Oklahoma.  See Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1019 (8th Cir. 2005).  In 2002, the Sales departments of ORS and Nasco were consolidated into one department headquartered in Muskogee, Oklahoma.  Manni began reporting to Scott Rosenzweig, the new Vice President of Sales, who worked from an Oklahoma office.  Rosenzweig and the rest of the Senior Team determined, prior to Manni becoming pregnant, that Manni's position should be relocated to Oklahoma to increase efficiency and communication.  ORS Nasco has therefore articulated a legitimate, nondiscriminatory reason for its actions.

While Manni proffers several reasons as to why ORS Nasco's legitimate business reasons are mere pretext for discrimination, Manni has not provided competent evidence to dispute that ORS Nasco made the decision to transfer her job to Oklahoma before she became pregnant with her second child.  Manni alleges that she had no knowledge before October 2003 that her job would be transferred to Oklahoma, but she also does not dispute that ORS Nasco chose not to

announce the job change because it had not yet determined the date that the position would be transferred to Oklahoma.  When it did finally determine the date, Manni was on disability leave, and ORS Nasco decided not to disturb her with news of her job relocation.  In her deposition, Manni admitted that ORS Nasco's decision not to inform her of her job transfer until she returned to work was reasonable.  Manni Dep. at 128.  The Eighth Circuit has said that "[o]n rare occasions, a close temporal connection between a protected activity and an adverse employment action may be sufficient to create an inference of retaliation" or discrimination.  Strate, 398 F.3d at 1019.  Here, however, no temporal connection exists since ORS Nasco made the decision to transfer Manni's position before she was pregnant.

Manni also claims that she was treated differently from other employees whose jobs were either eliminated or transferred.  She avers that other employees were offered "stay bonuses" or different positions within the company in Minnesota, but that she was offered neither.  However, ORS Nasco has demonstrated that "stay bonuses" were only offered to employees in 1999, at the time that ORS and Nasco first began consolidating the majority of their departments.  Also, employees such as Dave LaForte and Mike Leir were allowed to transfer into other, open positions in Minnesota after inquiring about them.  Manni did not inquire as to other positions in Minnesota, and even if she had, ORS Nasco avers that there were no job openings in Minnesota for which Manni was qualified at the time Manni's job ended.  Cook Aff. ¶ 16.

Manni avers that ORS Nasco's "conscious awareness" of her long absence from work during her first pregnancy impacted the decision to transfer her job.  However, Scott Rosenzweig, Manni's direct supervisor and the person who determined Manni's position would function better located in Oklahoma, did not become an ORS Nasco employee until 2003, well

17

after the birth of Manni's first child.  Also, Rosenzweig raised the issue of transferring Manni's

position to Oklahoma in May 2003, before Manni became pregnant with her second child.

Manni also points to statements made by Scheller, Rosenzweig, and Jackson that she

avers demonstrate discriminatory animus.  During the EEOC's investigation of ORS Nasco,

Scheller emphasized that ORS Nasco allowed Manni to take medical leave during her first

pregnancy at great inconvenience to the company.  Loos Dep. Ex. 3.  When Rosenzweig

discovered the amount of work Manni missed during her first pregnancy, he "gasped," asked if

she would miss the same amount of time during her second pregnancy, and allegedly stated that

he obviously wished she was at work instead of home sick.  Manni Aff. ¶ 14; Manni Dep. at 103.

When Jackson spoke to Manni in October 2003 about completing another short term disability

form for her hyperemesis, Jackson also asked her how much time she was planning on taking off

of work during her upcoming maternity leave.  Manni Dep. Ex. 23 at 3.

"Stray remarks" do not support an inference that an illegitimate criterion was a

motivating factor in an employment decision.  Gartman, 120 F.3d at 131.  Stray remarks are

"statements by nondecisionmakers or statements by decisionmakers unrelated to the decisional

process itself."  Id.  All three of the statements referenced by Manni are "stray remarks" and

therefore do not support an inference of discrimination.  Jackson's query to Manni regarding

how much time she would be taking off from work during her upcoming maternity leave appears

to be an attempt by a human resources employee to plan ahead for employee absences.  See

Manni Dep. at 153-54.  Even if there was a sinister motive behind Jackson's remark, it is a

statement by a nondecisionmaker and therefore not actionable.  Although the statements made by

decisionmakers Scheller and Rosenzweig focus on the amount of time missed from work, they

were made "unrelated to the decisional process itself," and therefore are also stray remarks.

Manni claims that the lack of documentation regarding the move is evidence of pretext. She avers that when her work week was reduced from five to four days, there were emails and memorandums documenting the change.  By contrast, there are no documents evidencing ORS Nasco's preparation to relocate her position to Oklahoma other than Rosenzweig's meeting notes.  ORS Nasco responds that the paperwork documenting Manni's reduced work week was prepared after the proposed change was accepted.  In the case of her job relocation, Manni immediately turned down the offer, and as a result, the company had no need to draft "acceptance" paperwork.  While it is true that there is a lack of paperwork documenting the proposed move in the record, there is no evidence to suggest that the lack of documentation should support an inference of pretext.

While a factual dispute exists as to whether or not Manni told Jeremy Jackson that she would return to work on October 28, Manni does not dispute that her supervisors and Minnesota co-workers did not know that she would return to work on October 28.  Manni also can not dispute that all members of the Sales department and the Senior Team were attending a national sales conference in Oklahoma on October 24-29, and were therefore unable to receive or return her messages.  Finally, Manni can not dispute that her passkey and computer password were disabled pursuant to office policy while she was out on disability leave.  While the combination of the non-functioning passkey and computer password, unreturned emails and phone messages, and "cold" behavior of co-workers seemed suspicious to Manni at the time, each of those events has an innocent explanation which Manni can not rebut with competent evidence.  In addition, Manni's position was one of eleven remaining ORS Nasco jobs in Minnesota after the majority

of the thirty "office" positions were transferred to Oklahoma.  While Loos, Muenzer, and Emmett worked in Sales and remained in Minnesota, Muenzer and Loos both held management-level positions, and Emmett was hired by Loos to serve as Loos' Sales Development Analyst. By contrast, Manni did not hold a management-level position, and her direct supervisor, Scott Rosenzweig, was located in Oklahoma.  After consideration of the entire record in the light most favorable to Manni, no genuine issue of material fact exists as to ORS Nasco's motivation for transferring Manni's job to Oklahoma, and summary judgment is appropriate.

**C.    Retaliation Claims**

Manni also asserts claims for retaliation under Title VII and the MHRA.  ORS Nasco argues that Manni's retaliation claims are barred for failure to exhaust administrative remedies. ORS Nasco avers that Manni alleged discrimination in her EEOC charge but not retaliation. Manni argues that her retaliation claims are like or reasonably related to her discrimination claims, and therefore she alleged sufficient facts in her EEOC charge such that she should be deemed to have exhausted her administrative remedies.

Before filing a lawsuit in federal court, a Title VII complainant must exhaust her administrative remedies with the EEOC.  Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994).  "A plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC."  Id.  However, "allegations outside the ambit of the predicate EEOC charge" are prohibited because their allowance "would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge."

Id. at 223.  The Eighth Circuit has also stated that "it is well established that retaliation claims are not reasonably related to underlying discrimination claims."  Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998).

In Manni's Charge of Discrimination filed with the EEOC, Manni checked a box to identify that she was alleging sex discrimination, but left the box for retaliation unchecked. Manni Dep. Ex. 36.  In the section for describing the particulars of the charge, Manni briefly relates the facts discussed above that comprise her discrimination charge, but fails to allege in any way how those facts also constitute a charge of retaliation.  Id.  Because Manni's retaliation claims are not reasonably related to her underlying discrimination claims, and do not otherwise grow out of the discrimination charge she filed with the EEOC, her retaliation claims must be dismissed for failure to exhaust administrative remedies.  See Wallin, 153 F.3d at 688-89.

Even if Manni's retaliation claims were not dismissed for failure to exhaust administrative remedies, they would still fail on the merits.  The same McDonnell Douglas burden shifting framework described above applies to Manni's retaliation claims, with a slightly different *prima facie* case.  To establish a *prima facie* case of retaliation, Manni must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action.  Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005).  For the same reasons stated with respect to Manni's discrimination claims, Manni can not establish a *prima facie* case of retaliation because she can not show that she suffered an adverse employment action.  Even if she could, her claims would still fail because she can not show that ORS Nasco's legitimate, nondiscriminatory reasons for its business actions were mere pretext for discrimination.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 12] is

**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 20, 2006.